J-S21045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 29 EDA 2024 |

Appeal from the Order Entered November 29, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000141-2022

| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 30 EDA 2024 |

Appeal from the Decree Entered November 29, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000295-2023

BEFORE:  LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 6, 2024**

T.H. (Mother) appeals from the decree terminating her parental rights to her minor daughter, S.H. (Child) (born in February 2022), and from the order changing Child's permanency goal from reunification to adoption.  We affirm the decree and order.

Mother's involvement with the Department of Human Services (DHS) began prior to Child's birth, in connection with Mother's first child. *See* N.T., 11/29/23, at 27.[1]  In February 2022, Mother "had a mental breakdown in the hospital" after giving birth to Child. *Id.* at 27-28.  DHS filed an application for emergency protective custody. *Id.*; *see also* Application for Emergency Protective Custody, 2/15/22; Dependency Petition, 2/24/22, ¶ 5 (alleging Mother "remains hospitalized for mental health treatment.").

The juvenile court granted the application on February 18, 2022, and adjudicated Child dependent on March 24, 2022.  The court appointed Lisa Marie Visco, Esquire, as Child's guardian *ad litem* (GAL).  The court set a permanency goal of reunification with Mother. *See* Order, 3/24/22.  The court further ordered Mother to undergo mental health treatment and provide treatment records; complete a parenting program; provide proof of housing and allow a housing assessment; and provide proof of employment or income verification. *Id.*

Following subsequent permanency review hearings, the juvenile court found Mother had made "minimal progress toward alleviating the circumstances which necessitated the original placement."  Orders, 6/15/22,

---

[1] The record indicates Mother's first child is in the custody of that child's father and is no longer subject to dependency proceedings.  N.T., 11/29/23, at 52-53.

5/23/23, and 8/22/23. The court noted ongoing concerns with Mother's mental health and ordered Mother to submit to drug testing. *See id.*

On August 9, 2023, DHS filed a petition for involuntary termination of Mother's parental rights and a petition to change Child's permanency goal to adoption.[2] The juvenile court held a combined termination and goal-change hearing on November 29, 2023. Mother was present and represented by counsel. GAL appeared on Child's behalf.

DHS presented testimony from Dr. Emily Salema,[3] a licensed psychologist. Dr. Salema testified that she attempted to complete a parental capacity evaluation of Mother on June 29, 2023. N.T., 11/29/23, at 11-12. Dr. Salema spoke with Mother "for about 30 minutes," during which Mother "provided numerous statements that were illogical and bizarre." Some of Mother's statements

> focused on issues related to HIV and AIDS, claiming that she and her siblings were able to cure a family member's AIDS. She

---

[2] DHS also sought termination of Child's father's parental rights. Child's birth certificate identified no father, and Mother initially refused to identify the father on the grounds that he was a married man. *See* Application for Emergency Protective Custody, 2/15/22, at 2 (unpaginated). Mother eventually disclosed the putative father's name, but DHS could not locate him. *See* Petition for Involuntary Termination of Parental Rights, 8/9/23, ¶¶ 4-5. DHS had no evidence the father had ever had contact with Child, and no one came forward to identify himself as Child's father. N.T., 11/29/23, at 42-43. The father did not appear or otherwise participate in the termination or dependency proceedings.

[3] Though her name is spelled "Salima" in the hearing transcript, Dr. Salema's curriculum vitae and report set forth her name's correct spelling. *See* DHS Exhibits 4 and 5.

discussed what appeared to be a rivalry between police officers and truck drivers in the 1800s. She made numerous statements suggesting that she was going to a mental hospital that day for intravenous medication, not psychotropic medication, but some type of intravenous medication. She also made reference to living in Georgia near a Navy [base,] and having some sort of conflict with an adult male.

*Id.* at 13-14; *see also* DHS Exhibit 5 (Dr. Salema's report, noting Mother claimed "she does not need psychotropic medication and she is not mentally ill."). Dr. Salema testified Mother demonstrated a lack of "connection with reality" and an inability to "engage in a discussion" or "understand the purpose of the evaluation." N.T., 11/29/23, at 18. Dr. Salema concluded Mother lacked the ability to parent Child or "make decisions about her [own] wellbeing or the wellbeing of anyone else." *Id.* at 16-17.

DHS also presented testimony from Lovedelia Grandoe, the family's Community Umbrella Agency (CUA) case manager. Ms. Grandoe testified DHS initially placed Child with a family member, but Mother repeatedly went to the family member's residence and started arguments. *Id.* at 28. At Mother's request, DHS placed Child with a different family member, but Mother continued to cause arguments. *Id.* In one incident, police were called after Mother tried to fight the family member, who was holding Child at the time. *Id.* Due to Mother's conduct, DHS removed Child from the family setting and placed her with a foster mother, where she has been since June 2022. *Id.* Ms. Grandoe testified Mother had difficulty understanding why Child was in foster care and not in Mother's custody. *Id.* at 29.

The juvenile court permitted Mother supervised visits with Child twice per week. *Id.* at 30. Ms. Grandoe testified Mother's attendance was inconsistent, with approximately 14 missed visits within the previous year. *Id.* at 30-31, 54-56; *see also* DHS Exhibit 7 (missed visit logs). Ms. Grandoe described Mother's concerning behavior during visits: "[E]very single visit[, Mother] is having inappropriate conversation with the [C]hild[,] where [Mother is] telling the [C]hild that [Child] has AIDS[, that the] caseworker gave her AIDS." N.T., 11/29/23, at 32. Mother also told Child that Child's older sibling had been sexually abused by family members. *Id.* Ms. Grandoe described Mother's visits as involving "just a lot of inappropriate conversation for a 20[-]month[-]old child." *Id.*; *see also* DHS Exhibit 6 at 2 (visitation assessment by CUA stating Mother "has to be told several times to stop using profanity in her visits."). According to Ms. Grandoe, when she questioned Mother about her behavior during visits, Mother responded, "it's my daughter, I can do what I want to do or say what I want to say to her." N.T., 11/29/23, at 33. Ms. Grandoe testified that Mother "really doesn't acknowledge the fact that what she say[s] is inappropriate." *Id.*

Ms. Grandoe testified Mother had received some mental health services at Serenity Safe Haven, but Mother was not consistent with the services. *Id.* at 35. Moreover, Ms. Grandoe indicated the services offered at Serenity Safe Haven were not sufficient to address Mother's psychiatric needs. *Id.* Ms. Grandoe was not aware of Mother completing any mental health treatment

that sufficiently addressed her needs. *Id.* at 36. Ms. Grandoe testified that, during a supervised visit, Mother stated she did not believe she needed mental health treatment. *Id.* at 32. According to Ms. Grandoe, Mother asserted that Ms. Grandoe, not Mother, was "the one that needs medication…." *Id.*

Ms. Grandoe testified Mother had been referred to the Joseph J. Peters Institute (JJPI) for trauma therapy. *Id.* at 40. JJPI reported concerns that Mother was having a mental breakdown and could not answer direct questions or stay on topic. *Id.*; *see also* DHS Exhibit 9 (August 17, 2023, report by JJPI psychologist noting Mother was "[n]ot currently taking psychiatric med[ication]" and had "serious untreated mental health challenges").

Ms. Grandoe testified that Mother tested positive for marijuana in multiple drug screens. N.T., 11/29/23, at 36; *see also* DHS Exhibit 8 (drug screen records indicating Mother tested positive for marijuana eight times between May 2023 and October 2023). According to Ms. Grandoe, Mother admitted using marijuana and drinking alcohol, but provided no evidence of drug or alcohol treatment. N.T., 11/29/23, at 32, 37.

Ms. Grandoe testified she visited Mother's residence in October 2023 and found it infested with roaches and flies. *Id.* at 38. She believed the residence was "not in a suitable condition for a child to reside in." *Id.* Ms. Grandoe further testified that Mother had not maintained consistent employment and failed to provide documentation of current employment. *Id.*

Ms. Grandoe acknowledged Mother had successfully completed a parenting class. *Id.* at 39.

Ms. Grandoe confirmed Mother has made minimal overall progress "toward mediating those concerns which brought [Child] into DHS's care." *Id.* at 41. She did not believe Mother was able to meet Child's needs or provide safety and stability. *Id.* at 45. In concluding Child's reunification with Mother was no longer a viable option, Ms. Grandoe particularly stressed Mother's failure to "adequately address[] her psychiatric needs." *Id.* at 41-42.

Ms. Grandoe stated her belief that Child would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 42. She testified Child does not look to Mother to fulfill her daily needs, does not consider Mother as a mother figure, and does not receive financial support from Mother. *Id.* at 43-44.

Ms. Grandoe testified that Child is doing well in foster care, and a parent-child bond exists between Child and the foster mother. *Id.* at 45-48. Child calls the foster mother "mama," frequently tries to hug her, and is smiling and happy around her. *Id.* at 45. The foster mother provides for Child's daily needs, medical appointments, and financial support. *Id.* at 45-46. The foster mother also has many family members who help her care for Child. *Id.* at 48. Ms. Grandoe noted Child is in a pre-adoptive home, and stated her belief that it is in Child's best interests to be adopted by the foster mother. *Id.* at 46.

Mother testified briefly, and had difficulty responding to questions. *See id.* at 63, 64, 66, 67, 68. Mother could not explain why she had missed scheduled visits with Child. *Id.* at 66. She testified she has lived at her current residence for two years and stated that pest extermination would be completed soon. *Id.* at 61. She maintained she is currently employed and works 25 hours per week. *Id.*; *see also* Mother's Exhibit 3 (Mother's paystub from early November 2023). Mother also stated she is currently on probation. N.T., 11/29/23, at 62.

Mother's counsel introduced medical records from Mother's primary care physician, which reflected Mother's diagnoses of catatonic schizophrenia and psychosis. *Id.* at 63-64; Mother's Exhibit 2 at 2. The records were dated November 29, 2023, as Mother had attended an appointment only a few hours before the termination hearing. *See* N.T., 11/29/23, at 65; Mother's Exhibit 2. The records called for Mother to receive an injection of antipsychotic medication at a follow-up visit. *See id.* at 2. Mother's counsel introduced additional documents indicating Mother had several future appointments scheduled. *See* Mother's Exhibit 1. Though Mother agreed she was willing to follow the treatment plan, she could not explain why she had gone to the doctor or articulate the purpose of the proposed treatment. N.T., 11/29/23,

at 65, 67-68.[4] **Mother testified she did not think she had schizophrenia or psychosis.** *Id.* at 67.

After DHS and Mother rested, the GAL stated, "the evidence is overwhelming that [M]other doesn't have the capacity [to parent Child] right now and nor [will] she have it in the near future." *Id.* at 72. The GAL stated Child was "in a loving home" with the foster mother and it was in Child's best interest to be adopted. *Id.*

At the hearing's conclusion, the juvenile court entered a decree terminating Mother's parental rights and an order changing Child's permanency goal to adoption.[5] Mother filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements at both dockets. The juvenile court has also complied with Rule 1925. This Court consolidated the appeals *sua sponte*.

Mother raises the following issues for our review:

1. Did the court below err in finding that [DHS] had met its burden in proving grounds for termination of parental rights under 23 Pa.C.S.A. § 2511[(a)]?

_____

[4] Dr. Salema testified that "[t]reatment of mental health issues as severe as" Mother's "is a prolonged process." N.T., 11/29/23, at 21-22. She noted Mother's November 29, 2023, medical records set forth "a treatment plan that outlines the start of that process[,] but there's nothing … that suggests that that process is underway as of today." *Id.* at 22.

[5] The juvenile court also terminated the parental rights of Child's father, who did not appeal.

2. Did the court below err in finding that DHS had met its burden to prove that termination would be in the [C]hild's best interests under [Section] 2511(b)?

3. Did the court below err when it found that DHS by clear and convincing evidence had met its burden to change [C]hild's goal to adoption?

Mother's Brief at 5.

In considering Mother's first and second issues, we recognize

appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the [juvenile] court's findings of fact and credibility determinations if they are supported by the record. Where the [juvenile] court's factual findings are supported by the evidence, an appellate court may not disturb the [juvenile] court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the [juvenile] court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. First, the juvenile court "must focus on the parent's conduct" relative to the enumerated grounds for termination set forth in 23 Pa.C.S.A. § 2511(a)(1)-(11). *Id.* at 830. If the court finds grounds for termination under Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Finally, this Court need only agree with the juvenile court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d at 830 (citation omitted).

Here, the juvenile court terminated Mother's parental rights to Child under Section 2511(a)(1), (2), (5), (8), and (b). We address Mother's termination under subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of

the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), DHS must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.***; ***see also In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) ("[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." (citation omitted)). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019).

"[T]he effect of [a parent's] mental health on her parenting ability" may constitute grounds for termination under Section 2511(a)(2). *In re A.H.*, 247 A.3d at 443. In *A.H.*, this Court affirmed a termination decree under Section 2511(a)(2), where the orphans' court determined:

> that [m]other suffers from untreated psychiatric disorders … ; that her mental health disability rendered her incapable of parenting; and finally, that [m]other's refusal to meaningfully treat her mental health meant that she could not remedy her parental incapacity.

*Id.* Though the mother had made "some progress" and demonstrated some "legitimate efforts to treat her mental health issues," we concluded the evidence supported the orphans' court's determination that her progress was insufficient, and that she was incapable of parenting. *Id.* at 444.

Here, Mother similarly argues DHS failed to meet its burden under Section 2511(a)(2). Mother's Brief at 14-15. She maintains she "did make progress" and initiated efforts to remedy her mental health conditions, even if those efforts were not completed at the time of the hearing. *Id.* at 14. Mother asserts the evidence did not support the juvenile court's conclusion that her incapacity "cannot or will not be remedied…." *Id.* at 15 (quoting 23 Pa.C.S.A. § 2511(a)(2)).

The juvenile court disagreed, and made the following findings relevant to Section 2511(a)(2):[6]

> This [c]ourt finds without any pleasure that [DHS] has met its burden by clear and convincing evidence through credible witness testimony to involuntarily terminate [M]other's rights…. [Mother's] progress was minimal throughout the life of the entire case.
>
> ….
>
> With regard to [Section] 2511(a)(2), … Mother doesn't seem to comprehend or is not in the same reality as other participants in this [C]hild's life or with anyone in this room at this point. Mother wasn't able to complete a [parental capacity evaluation,] or have a meaningful evaluation because she is disengaged from reality and is having delusional thoughts[,] as [was] demonstrated quite clearly when she took the stand today[,] when she was unable to even respond with any cognitive ability to the questions being asked by her counsel. She was unable to focus. She was unable to answer the questions.

N.T., 11/29/23, at 74-76.

The juvenile court concluded it had "no reason to find that [M]other has the ability to remedy the situation which led to the [C]hild coming into care." *Id.* at 75. The court rejected Mother's counsel's request for additional time to enable Mother to pursue mental health treatment, reasoning as follows:

> This [c]ourt does not find that … additional time would be able to sufficiently demonstrate that [Mother] could safely parent this [C]hild. She has had the 20 months since the [dependency] adjudication. It's not that she was only given that opportunity [a few months ago]. … [S]he's had that opportunity since this case opened and did not demonstrate an ability to do that. She's

---

[6] The juvenile court did not file a detailed written opinion, but its short Rule 1925(a) opinion incorporated the findings and conclusions it made on the record at the termination hearing. *See* Rule 1925(a) Opinion, 2/13/24, at 1-2; *see also* N.T., 11/29/23, at 74-79.

- 14 -

disagreeing with the documents that her own attorney was producing today [as to] her own diagnoses and her needs[,] and she fails to comprehend them. [The court does not] find that … additional time will enable her to do that. Showing documents that she has future appointments[,] when [M]other has missed other appointments that have been scheduled for her in the past[,] is not persuasive to the [c]ourt.

*Id.* at 76.[7]

The record supports the juvenile court's findings, and we discern no error or abuse of discretion in its conclusion that DHS established grounds for termination under Section 2511(a)(2). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, Mother's first issue merits no relief.

_____

[7] The juvenile court also found:

It has been … [g]oing on a year and a half … since the removal of the [C]hild [from Mother's care]. … And the conditions which led to removal or placement clearly still exist as to [M]other[,] as demonstrated by her behavior in court today and the reports that we received [from Dr. Salema and JJPI. *See* DHS Exhibits 5 and 9. The court does not] find that any additional time would remedy the situation… [The court does not] find that [M]other could safely handle this [C]hild today. [The court also finds] that [the] interactions that have been described of [M]other with the [C]hild don't demonstrate … that [M]other has the ability to parent this [C]hild. She has completely inappropriate conversations with a one[-]year[-]old child.

N.T., 11/29/23, at 77-78.

In her second issue, Mother challenges termination of her parental rights under Section 2511(b). Mother's Brief at 18-21. "The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted).

This Court has repeatedly stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.W.U., Jr.*, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted). "[T]he court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Interest of: J.R.R.*, 229 A.3d 8, 12-13 (Pa. Super. 2020) (citation and quotation marks omitted); *see also In re T.S.M.*, 71 A.3d at 268 (stating, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition.").

Here, Mother argues DHS presented "inadequate testimony concerning the likely effect on [Child] of permanently severing any bond that might exist" between Mother and Child. Mother's Brief at 19. Mother also argues the juvenile court rendered "inadequate analysis of the effect of severing any bond that might exist" between Mother and Child. *Id.* Mother maintains DHS failed

to "prove by clear and convincing evidence that termination would be in [Child's] best interests under [Section] 2511(b)." *Id.* at 21.

The juvenile court rejected Mother's claim:

With regards to [Section] 2511(b), [the court does not find] that there is a parent[-]child bond between [Child] and [M]other…. [Child] does not look to [Mother] to meet any of [Child's] daily needs. [Child] will not suffer any irreparable harm if [Mother's] parental rights are terminated[,] as the [C]hild does not look to [Mother] to meet any parental needs[,] and [the court] find[s] that [DHS has met] its burden through clear and convincing evidence to establish this element under [Section] 2511(b). … [The court finds that Child] has been in a loving home [with the foster mother] … [f]or quite some time and it would be in the [C]hild's best interest to free [her] for adoption.

N.T., 11/29/23, at 78-79; *see also id.* at 78 (juvenile court finding "that termination of [Mother's] parental rights would best serve the needs and welfare of [Child,] as it would free [Child] for adoption and allow her to have permanency in her life.").

Our review discloses the record supports the juvenile court's findings and conclusions. While Mother asserts the juvenile court inadequately considered "the effect of severing any bond that might exist" between Mother and Child, she fails to demonstrate that any such bond, in fact, existed. Mother's Brief at 19; *see id.* at 18-21. Mother cites to nothing in the record establishing that a parent-child bond existed between Mother and Child, and identifies no evidence of any adverse effect Child might suffer should termination be granted. *Id.*

DHS presented evidence that Child did not look to Mother as a parent; Mother did not perform parental duties; and Mother had an inconsistent and inappropriate relationship with Child during supervised visits. N.T., 11/29/23, at 30-33, 42-43. DHS also presented evidence that a parent-child bond exists between Child and the foster mother; Child calls the foster mother "mama" and has an affectionate relationship with her; the foster mother provides for Child's daily needs, medical appointments, and financial support; and the foster mother has extended family support in caring for Child. *Id.* at 45-48. Ms. Grandoe testified it was in Child's best interests to be adopted by the foster mother, and the GAL agreed. *Id.* at 46, 72.

On the basis of this evidence, we discern no error or abuse of discretion in the juvenile court's determination that DHS established termination would best serve the needs and welfare of Child under Section 2511(b). Therefore, Appellant's second issue merits no relief.

In her third issue, Mother challenges the juvenile court's order changing Child's permanency goal from reunification to adoption. *See* Mother's Brief at 22-23. As we have upheld the termination of Mother's parental rights, this issue is moot. *See Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (parent's challenge to child's goal change was moot after this Court affirmed the termination decree).

Accordingly, we affirm the decree terminating Mother's parental rights to Child, and the order changing Child's permanency goal to adoption.

Decree and order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/6/2024